OPINION OF THE COtiRT
J. Emmett Murphy, J.
*503 Ordered that the motion is granted and the complaint is dismissed.
Plaintiffs commenced this action to rescind the purchase of a racehorse and for money damages under the following theories: breach of contract, breach of implied covenant of good faith and fair dealing, fraud based upon express representations, negligent misrepresentations, unjust enrichment, consumer fraud, breach of express warranty, breach of implied warranty of merchantability and breach of implied warranty of fitness.
Plaintiff was the successful claimant of a harness racehorse at a claiming race run at Yonkers Raceway on September 27, 2003, which died three days after the race while in the care of plaintiff from acute respiratory distress allegedly due to the administration of a “milk shake” within 24 hours of the day of the race by defendant owners. Milk shaking is the illegal practice of administering a baking soda and water mixture into the horse’s stomach through a tube inserted through the nostril or otherwise in order to reduce the build up of lactic acid in the muscles to increase the horse’s performance. The fluid allegedly went into the horse’s lungs, causing acute respiratory distress and the horse’s death by euthanasia.
In a claiming race, the owner of the horse places the horse in a race and sets a claiming price on the horse. The horse can be claimed by another licensed horse owner for the stated claiming price in that particular race. If no claim is placed on the horse prior to the running of the race, the horse is not claimed and remains the property of the owner. However, if a claim is put in with the presiding judges or stewards at the racetrack, then immediately upon the commencement of the running of the particular race, the claimant becomes the owner of the horse. The rules and regulations governing claiming races are established by the New York State Racing and Wagering Board and have the force and effect of a statute (see Bittrolff v Ho’s Dev. Corp., 77 NY2d 896 [1991]). The rule regarding vesting of title provides:
“Vesting of title. Every horse claimed shall race in all heats of race in the interest and for the account of the owner who declared it to such race, but title to the claimed horse shall be vested in the successful claimant from the time word ‘Go’ is given by the starter in the first heat, and said successful claimant shall become the owner of the horse, whether it be alive or dead, sound or unsound, or injured either *504 before, during or after the race, except for a misrepresentation as to the sex or age of such animal and except as hereinafter provided in'subdivision (o) of this section” (9 NYCRR 4109.3 [i]).
Subdivision (o) provides that “[i]n the .event of a positive test for equine infectious anemia the ownership of the claimed horse shall revert to the owner from whom thé horse was claimed and the claiming monies shall be returned to the person who claimed the horse.”
A prospective claimant has the right to conduct an inspection of any horse programed to start in a claiming race between 11:30 a.m. and 12:00 noon on the day of the race. For purposes of such inspection, all bandages, blankets, equipment and other coverings shall be removed from the horse upon request of the person inspecting the animal (9 NYCRR 4109.3 [m]).
With exception of a specific horse’s age and sex, no express representations are made prior to the start of the claiming race. The regulation, which mandates the vesting of title in the claimant at the start of the race, regardless of whether the horse is alive or dead, sound or unsound, or injured before, during or after the race, negates any express or implied warranties, except for age and sex. The successful claimant, who had an opportunity to inspect the horse prior to the race, accepts the horse at the start of the race “as is” and has no legal basis under the regulations for rejecting the goods on the ground the horse was in acute respiratory distress — unsound—after the race due to any injury, which occurred either before, during or after the race, since the risk of such loss under the regulations is imposed upon the claimant. Consequently, absent a misrepresentation as to age or sex, which is not alleged, the complaint does not plead a cause of action against' the owner who enters the horse in a claiming race for either recision or damages for breach of contract, fraud, negligent representations, breach of express warranty, breach of implied warranty of merchantability or implied warranty of fitness for an intended purpose.
With the exception of the misrepresentation as to age or sex (see Brodsky v Nerud, 68 AD2d 876 [1979]), the only other grounds for voiding a claim under the Racing and Wagering Board’s regulations is a positive test result for equine infectious anemia (9 NYCRR 4109.3 [o]), a post-race blood or urine sample *505 that tests positive for the use of unauthorized substances,* or an unreported neuroectomy and an undisclosed pregnancy (9 NYCRR 4109.7). A positive post-race urine and blood sample for voiding a claim for the unauthorized use of a foreign substance by an unscrupulous owner, who seeks to profit by illegally enhancing the performance level of the racehorse to win the purse, while potentially placing the horse’s health at risk, is a ground for voiding the sale, but not one for recovering damages for injury to the horse. However, no positive post-race test results for the use of an unauthorized substance were alleged in the complaint. Nor did defendants profit from their alleged illegality as the subject horse did not win the race or share in the purse.
Nor can a claimant resort to the buyer’s remedies under the general provisions applicable to the sale of goods under article 2 of the Uniform Commercial Code, absent a showing that the claim is voidable under the rules and regulations of the Racing and Wagering Board, which specifically governs the sale or transfer of racehorses at claiming races (see e.g., Brodsky v Nerud, supra). The dearth of case law pertaining to suits to rescind a claim or to recover damages for the condition of the horse after a race is indicative of a well-established and recognized racing policy that construes the claiming race procedure for acquiring a racehorse as an “as is” sale, with no recourse to the unhappy claimant buyer, except for specific exceptions set forth in the rules and regulations, which do not apply herein.
Plaintiff argues that the administration of a milk shake was not detectable from post-race blood or urine samples, because the unauthorized solution entered the horses lungs and, therefore, the court should invoke equity to shield claimants from defendants’ unlawful or inequitable conduct.
However, defendants have proffered documentary evidence that three weeks before the subject race, when plaintiff was the owner of this horse, plaintiffs trainer was found guilty by the New Jersey Racing Commission of illegally administering a milk shake solution to the same horse at issue in this action, based on positive post-race testing results which exceeded specified TOC2 levels at Freehold Raceway. The 75-day suspension and $1,000 fine imposed upon plaintiff’s agent and the guarded *506 quarantine of the subject racehorse was stayed pending an appeal. Plaintiff comes to this court seeking relief in equity with unclean hands. While a court should not lend its aid to a corrupt or evil design, one who seeks equity must do equity. Under the circumstances, any claim sounding in equity is barred by the doctrine of unclean hands.
Since the complaint fails to state any viable cause of action, defendants’ motion to dismiss is granted.

 The unauthorized practice of milk shaking can be detected by post-race test results which exceed specified “TOC2” levels.